747 S.E.2d 178

**PROGRESSIVE MAX INSURANCE COMPANY, Appellant,**

v.

**FLOATING CAPS, INC., d/b/a Silver Dollar Cafe, Respondent.**

Appellate Case No. 2011–196906.

No. 27293.

Supreme Court of South Carolina.

Heard April 16, 2013.

Decided Aug. 7, 2013.

38

John Martin Grantland, Adam J. Neil, and Timothy J. Newton, all of Murphy & Grantland, of Columbia, for Appellant.

Francis Marion Ervin, II, of Rogers Townsend & Thomas, of Charleston, for Respondent.

Justice BEATTY.

Progressive Max Insurance Co. (Progressive), an automobile insurer, brought this contribution action against Floating Caps, Inc., d/b/a Silver Dollar Cafe (Silver Dollar), a Charleston bar, pursuant to South Carolina's Uniform Contribution Among Tortfeasors Act (UCATA) after Progressive settled a tort action involving a Silver Dollar patron. The circuit court found the contribution claim was not preserved and granted summary judgment to the Silver Dollar. This Court certified the case for review in accordance with Rule 204(b), SCACR. We affirm.

## I. FACTS

Robert M. Witherspoon, IV (Witherspoon) brought separate tort actions in federal court against Ryan McGuire (a minor under the age of 21) and McGuire's parents for injuries he sustained in the early morning hours of November 17, 2003, when McGuire drove into Witherspoon as he stood on King Street outside the Silver Dollar. Witherspoon asserted a negligence claim against McGuire and a negligent entrustment action against McGuire's parents, who were the owners of the vehicle McGuire was driving. The actions were consolidated. Witherspoon did not bring an action against the Silver Dollar.[1]

The McGuires had automobile insurance coverage with Progressive, which agreed to defend and indemnify them pursuant to the terms of the insurance policy. On April 7, 2007, Witherspoon settled his tort claims against the McGuires for a total of $200,000. Witherspoon intended thereafter to pursue underinsured motorist (UIM) coverage.

---

1. In an affidavit, Witherspoon's attorney, Johnny F. Driggers, stated he was aware of potential tort claims against the Silver Dollar, but he made a "tactical decision" not to pursue them so as "not to diffuse any liability against Ryan McGuire[.]"

In settling the tort action, the parties entered into a "Covenant Not to Execute" (First Covenant) dated April 20, 2007, approximately five months after the statute of limitations had run on Witherspoon's claims in the tort action. Witherspoon was designated the "Covenantor," while the McGuires, Progressive, and The Cincinnati Insurance Companies (which provided an umbrella policy for the McGuires) were the declared "Covenantees." The First Covenant provided that, in consideration of a total sum of $200,000, of which $180,000 was paid by Progressive and $20,000 was paid by The Cincinnati Insurance Companies, the parties agreed that, in the event Witherspoon was unable to resolve his claim for any UIM coverage or liability coverage that might be applicable, Witherspoon "shall have the right to bring suit against the Covenantees, Kevin McGuire, Betty McGuire and Ryan McGuire, and prosecute same to final judgment." The parties further agreed that, "[n]otwithstanding any judgment that may be rendered in said suit, it is the express intent of the parties that the Covenantees, their respective heirs and assigns, shall never at any time, be liable to the Covenantor ... beyond the consideration expressed herein...."

The First Covenant further provided that it was not a release of any other persons or entities:

3. Covenantor and Covenantees **expressly reserve all rights of action, claims,** demands or other legal remedies **against all firms and persons** except as modified by the terms of this Covenant. **This Covenant is not a release, nor shall it be construed as a release of any party, person, firm or corporation.**

4. Covenantor will fully and forever prevent and bar the collection of any additional payments of any kind, nature or description **against the Covenantees ... with the exception of underinsured motorist coverage.**

(Emphasis added.)

Thereafter, on May 8, 2007, Witherspoon's tort action was dismissed by the federal district court in Charleston. By that time, Witherspoon's UIM claim reportedly had been resolved.

Upon realizing the First Covenant did not mention the Silver Dollar or extinguish its potential liability, Witherspoon, the McGuires, and Progressive entered into another "Cove-

nant Not to Execute" (Second Covenant) on July 31, 2007. The Second Covenant included an acknowledgement by Witherspoon that he had a cause of action against the Silver Dollar and that the Covenantees were "desirous of pursuing a claim for contribution against [t]he Silver Dollar" pursuant to UCATA. Missing from the Second Covenant, however, was an explicit statement that the Second Covenant served either to release or to discharge any liability of the Silver Dollar in the underlying tort matter. To the contrary, it reiterated, "This Covenant is not a release, nor shall it be construed as a release of **any** party, person, firm or corporation." (Emphasis added.)

In September 2007, Progressive filed this contribution action against the Silver Dollar. Progressive alleged the Silver Dollar was jointly liable because it served the underage McGuire alcohol on November 17, 2003, both during regular business hours and after the bar had closed, and that McGuire had become intoxicated prior to the accident. Progressive stated it had settled the case on behalf of all potentially liable parties, including the Silver Dollar, and that Witherspoon had released the McGuires and the Silver Dollar, but the Silver Dollar did not pay its pro-rata share of the settlement.

The Silver Dollar answered and moved for summary judgment on the ground the First Covenant failed to expressly discharge the liability of the Silver Dollar as required by UCATA in order to seek contribution. Progressive opposed summary judgment and attached an affidavit of Witherspoon's attorney stating the parties intended the settlement to extinguish any potential claim by Witherspoon against the Silver Dollar and asserting the Second Covenant "contains an express recital protecting Progressive's claim against [the] Silver Dollar," which was "evidence of the parties' intent." In a supporting memo, Progressive maintained the failure to include language in the First Covenant discharging the Silver Dollar's liability "was the result of a mere scrivener's error," and it asked that the court "either allow the extrinsic evidence of intent or reform the written instrument to comport with the intent of the parties."

The circuit court granted the Silver Dollar's motion for summary judgment, finding Progressive had failed to properly

preserve its right to contribution from the Silver Dollar. The circuit court noted the First Covenant expressly stated that it did not extinguish the liability of any other persons or entities, thus Progressive had settled on behalf of only its insureds and did not pay any common liability that might exist with the Silver Dollar in order to be entitled to pursue a contribution claim against the Silver Dollar. In addition, the circuit court rejected Progressive's arguments that the Second Covenant it executed to correct this deficiency after the dismissal of the tort action should relate back so as to preserve its contribution claim, and the court denied the request for reformation of the First Covenant.

## II. STANDARD OF REVIEW

Rule 56(c) of the South Carolina Rules of Civil Procedure provides a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In determining whether any triable issues of fact exist, the trial court must view the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the party opposing summary judgment. *Brockbank v. Best Capital Corp.*, 341 S.C. 372, 534 S.E.2d 688 (2000). "An appellate court reviews the granting of summary judgment under the same standard applied by the trial court pursuant to Rule 56, SCRCP." *Id.* at 379, 534 S.E.2d at 692.

## III. LAW/ANALYSIS

On appeal, Progressive contends (1) the circuit court erred in ruling it could not consider extrinsic evidence of the parties' alleged intent to extinguish the Silver Dollar's liability in the settlement and obtain contribution; (2) there is, in fact, extrinsic evidence in the record of the parties' true intent, so reformation of the covenant is warranted based on mutual mistake; and (3) the covenants themselves provide evidence of the parties' intent to extinguish the liability of the Silver Dollar.

In contrast, the Silver Dollar asserts the circuit court properly granted its motion for summary judgment. It maintains the language of the First Covenant was clear and unambiguous, so a court may not look beyond the four corners of the document in assessing the parties' intent. Because the agreement did not release the Silver Dollar or any other parties from liability, the Silver Dollar argues Progressive is not entitled to contribution as it did not pay any sums on behalf of others. Further, Progressive's preparation of the Second Covenant in an attempt to correct the deficiencies in the first came after the tort action had already been dismissed, so Progressive failed to preserve its contribution rights under UCATA as a matter of law.

UCATA was enacted by the General Assembly in 1988.[2] *See* S.C.Code Ann. §§ 15–38–10 to –70 (2005 & Supp.2012). Section 15–38–50(1) of UCATA provides that a release or a covenant (not to execute or not to sue) involving one tortfeasor "does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide...." S.C.Code Ann. § 15–38–50(1) (2005).

In denying Progressive's request for contribution, the circuit court noted at the outset that a tortfeasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor whose liability for the injury is not extinguished by the settlement. *See id.* § 15–38–20(D).

Moreover, section 15–38–40(D) provides that, where there has been no judgment entered against the tortfeasor seeking contribution, his right of contribution is barred unless he has either:

---

2. UCATA codified the state's common law, which had abandoned the strict rule that the release of one tortfeasor automatically released all tortfeasors. *See Mickle v. Blackmon*, 252 S.C. 202, 224, 166 S.E.2d 173, 182 (1969) (discussing the harsh effects of "the ancient common-law rule that, regardless of the intention of the parties, the release of one joint tort-feasor releases all"); *see also Bartholomew v. McCartha*, 255 S.C. 489, 492, 179 S.E.2d 912, 914 (1971) (judicially adopting the two-part rule that the release one of tortfeasor does not release all unless it was the parties' intent and the plaintiff has, in fact, received full compensation amounting to a satisfaction); *Bowers v. S.C. Dep't of Transp.*, 360 S.C. 149, 155, 600 S.E.2d 543, 546 (Ct.App.2004) (observing "UCATA mirrors the rule in *Bartholomew* ").

(1) discharged by payment the common liability **within the statute of limitations period** applicable to [the] claimant's right of action against him and has commenced his action for contribution within one year after payment, **or** (2) agreed **while [an] action is pending against him** to discharge the common liability and has within one year after the agreement paid the liability and commenced his action for contribution.

*Id.* § 15–38–40(D) (emphasis added).

The circuit court reasoned that, since Progressive entered into the First Covenant on April 20, 2007, approximately five months *after* the statute of limitations had run on the underlying tort claim by Witherspoon, section 15–38–40(D)(1) did not apply to allow this contribution claim as no payment was made discharging the common liability within the applicable statute of limitations. Therefore, Progressive could maintain a contribution action against the Silver Dollar only if it has met the requirements of section 15–38–40(D)(2) and section 15–38–50(1).

We agree with the circuit court's determination that (D)(1) is not applicable here because it is undisputed that no payment was made prior to the expiration of the statute of limitations on the tort claim.

In contrast, (D)(2) provides an exception allowing contribution if the tortfeasor seeking contribution has agreed, *while the action is pending against him,* to discharge the common liability and has within one year after the agreement paid the liability and commenced his contribution action. The circuit court found the First Covenant did not mention the Silver Dollar or expressly state an intention of the parties thereto to extinguish or discharge the liability of the Silver Dollar.[3] Therefore, as a *matter of law,* the First Covenant did not extinguish the alleged liability of the Silver Dollar in the tort claim brought by Witherspoon, and no claim for contribution was preserved by the First Covenant under (D)(2).

The circuit court next turned its consideration to the effect of the Second Covenant. The court observed that the under-

---

**3.** The circuit court indicated it is undisputed that Progressive instituted its contribution claim and made payment within one year of the agreement.

lying tort action was dismissed by consent order on May 8, 2007 and, thereafter, on July 31, 2007, Progressive and Witherspoon executed the Second Covenant. The court stated that, at the hearing, Progressive had advised the court that the Second Covenant was executed to correct a mutual mistake in the First Covenant and had argued the Second Covenant should relate back to the date of the signing of the First Covenant.

The circuit court stated, however, that it was "not persuaded by this argument" and, further, that "the requirements of [section] 15–38–40(D)(2)" were not met by the Second Covenant. The court noted the underlying tort case was dismissed on May 8, 2007, so Progressive's execution of the Second Covenant on July 31, 2007 was not made while the action was still pending as required by (D)(2) and, thus, could not preserve any right to contribution from the Silver Dollar. The court found "as a matter of law that any right to contribution [Progressive] may have had against [the Silver Dollar] was forever barred once [the underlying tort action] was dismissed on May 8, 2007." Having determined there were no questions of fact, the court granted the Silver Dollar's motion for summary judgment.

Upon receiving Progressive's motion to alter or amend the judgment, the circuit court issued an order denying the motion, but stating the motion was, nevertheless, appropriate as its prior order "did not specifically address Progressive's argument that [because] the second covenant corrected a mutual mistake in the first, it 'relates back' to the first covenant such that the covenant was executed in a timely fashion according to the requirements of the statute."

The circuit court recited the law on the reformation of contracts on the basis of mutual mistake, and the court agreed "that the evidence demonstrates at least a question of fact regarding whether both parties to the agreement mistakenly failed to include a discharge of Silver Dollar's liability." However, the court disagreed with Progressive's assertion that the Second Covenant should be treated as a reformed version of the original and should relate back to the date of the First Covenant. The court found the Second Covenant did not satisfy the statutory requirements for preserving a contribu-

tion claim because, "[o]nce the underlying [tort] case was dismissed on May 8, 2007, Progressive's subsequent execution of the July 31, 2007 covenant could not preserve any right to contribution against the [Silver Dollar.]" Progressive argues the circuit court erred in failing to consider extrinsic evidence of its intent and in failing to reform the parties' agreement.

Covenants not to execute are treated as contracts and, as such, they are governed by general contract law. *Cf. Bowers v. S.C. Dep't of Transp.*, 360 S.C. 149, 600 S.E.2d 543 (Ct.App.2004) (stating a release is a contract, to which the general principles of contract law apply). "The law in this state regarding the construction and interpretation of contracts is well settled." *ERIE Ins. Co. v. Winter Constr. Co.*, 393 S.C. 455, 461, 713 S.E.2d 318, 321 (Ct.App.2011). "In construing a contract, it is axiomatic that the main concern of the court is to ascertain and give effect to the intention of the parties." *D.A. Davis Constr. Co. v. Palmetto Props., Inc.*, 281 S.C. 415, 418, 315 S.E.2d 370, 372 (1984).

"If its language is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required and the contract's language determines the instrument's force and effect." *Ellie, Inc. v. Miccichi*, 358 S.C. 78, 93, 594 S.E.2d 485, 493 (Ct.App.2004); *see also C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n*, 296 S.C. 373, 377–78, 373 S.E.2d 584, 586 (1988) (observing where a contract is clear and unambiguous, "[e]xtrinsic evidence giving the contract a different meaning from that indicated by its plain terms is inadmissible"); *Ecclesiastes Prod. Ministries v. Outparcel Assocs.*, 374 S.C. 483, 497–98, 649 S.E.2d 494, 501–02 (Ct.App.2007) (stating a court must first look to the language of the entire contract to determine the parties' intent and if the language is perfectly plain, "it alone determines the document's force and effect"). "Parties are governed by their outward expressions and the court is not at liberty to consider their secret intentions." *Blakeley v. Rabon*, 266 S.C. 68, 73, 221 S.E.2d 767, 769 (1976).

On the other hand, a contract is ambiguous when its terms are capable of having more than one meaning when viewed by a reasonably intelligent person who has examined the entire agreement. *Hawkins v. Greenwood Dev. Corp.*, 328

S.C. 585, 592, 493 S.E.2d 875, 878 (Ct.App.1997). When a written contract is ambiguous, parol and extrinsic evidence may be admitted regarding the parties' intent. *See id.* at 592, 493 S.E.2d at 888–89 ("Once the court decides that the language is ambiguous, evidence may be admitted to show the intent of the parties."); *see also C.A.N. Enters., Inc.*, 296 S.C. at 378 n. 3, 373 S.E.2d at 587 n. 3 (noting extrinsic evidence may be considered if a contract is found to be ambiguous (citing *Williams v. Teran, Inc.*, 266 S.C. 55, 221 S.E.2d 526 (1976))).

■ We agree with the Silver Dollar that the language of the First Covenant was clear and unambiguous, and Progressive does not dispute that it, standing alone, did not preserve its contribution claim. Further, we find the Second Covenant did not cure any deficiency, as it too failed to expressly provide that the liability of the Silver Dollar (or any other person or entity) was being extinguished. Rather, although the Second Covenant recited the fact that the parties were aware of a potential claim against the Silver Dollar and that Progressive desired to pursue a claim for contribution, it again contained the recitation that the document was not a release of *any* other person or entity. In addition, the Second Covenant was executed after the underlying tort action had already been dismissed, so for the reasons fully discussed by the circuit court, it did not fall within the parameters of the contribution statutes, particularly section 15–38–40(D)(2).

Thus, only if reformation is allowed can Progressive prevail on its contribution claim. *Cf. C.A.N. Enters., Inc.*, 296 S.C. at 378, 373 S.E.2d at 587 (stating "[w]e are without authority to alter a contract [using rules of] construction"). Progressive contends the Second Covenant was prepared to correct the deficiency in the First Covenant and as such it should relate back to the date of execution of the First Covenant, which occurred when the underlying tort action was still pending. It further contends the circuit court erred in failing to consider extrinsic evidence of the parties' intent.

Although both parties contest on appeal whether or not the circuit court could look beyond the four corners of the parties' agreement, the circuit court did agree with Progressive that there was evidence of mutual mistake, so the court arguably

did consider extrinsic evidence to some extent. However, the court seemed to confine its examination to the contents of the Second Covenant. The circuit court found the Second Covenant was inadequate under the UCATA provisions because it was executed after the underlying tort action had already been dismissed, and concluded it did not relate back to preserve any contribution rights Progressive might have had.

Assuming there was evidence of mutual mistake regarding the First Covenant, however, any reformation would be effective as of the date of its execution, which was while the underlying tort action was still pending. Moreover, any deficiencies in the Second Covenant are not necessarily determinative because the parties could have sought reformation even in the absence of executing a new document, but the court did not appear to rely upon other extrinsic evidence offered by Progressive regarding the parties' intent, such as the affidavit of Witherspoon's counsel. Thus, the exact nature of the court's ruling regarding the admissibility of extrinsic evidence is unclear. For the reasons that follow, however, we agree with the circuit court's ultimate conclusion to grant summary judgment to the Silver Dollar.

As to the use of extrinsic evidence, the Silver Dollar primarily relies upon *Bowers v. South Carolina Department of Transportation*, 360 S.C. 149, 600 S.E.2d 543 (Ct.App.2004) to support its argument that extrinsic evidence was not admissible to vary the terms of the First Covenant. In *Bowers*, the Court of Appeals considered a dispute over the meaning of two releases that were executed following a traffic accident in light of the trial court's ruling that their release of the tortfeasor "and all other persons, firms, or corporations liable . . . from any and all claims [or] damages" as a "full and final . . . settlement . . . precluding forever any further . . . claims" barred a later suit for damages against SCDOT. *Id.* at 152, 600 S.E.2d at 544. The Court of Appeals stated a release is a contract, and in construing its terms, a court must first look to the language of the contract to determine the intentions of the parties. *Id.* at 153, 600 S.E.2d at 545. The court held that, "[s]ince the [r]elease unambiguously sets forth the contracting parties' intent, we are bound by that clearly expressed intent without resort to extrinsic evidence." *Id.* at 153, 600 S.E.2d at 545. The court stated, "Extrinsic evidence giving the contract

a different meaning from that indicated by its plain terms is inadmissible." *Id.* at 153–54, 600 S.E.2d at 545. The court concluded that "the circuit court applied the proper summary judgment standard and correctly determined Appellants' unmistakable intent from the terms of the [r]elease without resort to affidavits and deposition excerpts." *Id.* at 154, 600 S.E.2d at 545.

We find *Bowers* and the similar line of cases proscribing reliance on extrinsic evidence where a contract is clear and unambiguous are distinguishable from the instant appeal because they were contract *construction* cases where the concept of *reformation* was not at issue. Here, Progressive admits that the First Covenant did not contain an extinguishment of the Silver Dollar's liability, so there is no dispute as to its construction or interpretation. Rather, Progressive argues the agreement should be reformed because the parties made *a mutual mistake* in failing to include language discharging the potential liability of the Silver Dollar so Progressive could seek contribution. Progressive argues extrinsic evidence is admissible to show this intent. Specifically, it contends the affidavit of Witherspoon's attorney attests to this intent and further, that the existence of the Second Covenant itself is evidence that the parties recognized and wanted to correct a mutual mistake made in the First Covenant.

Although the clear and unambiguous language of the contract is controlling in contract construction cases, our jurisprudence has recognized that different considerations apply where a party seeks reformation of a contract. In such circumstances, the rules of construction, such as the ban on extrinsic evidence, do not apply.

"A contract may be clear and unambiguous as far as it goes and yet may not express the agreement of the parties, by reason of mutual mistake." *S. Realty & Constr. Co. v. Bryan,* 290 S.C. 302, 309, 350 S.E.2d 194, 198 (Ct.App. 1986) (quoting 66 Am.Jur.2d *Reformation of Instruments* § 6 (1973)). "[A]mbiguity or uncertainty has nothing to do with the reformation of a written instrument, but rather reformation is adjudged because the instrument, by reason of mistake or fraud, does not embody the true agreement of the parties." *Id.* The court explained, "Both the parol evidence rule and the

doctrine of merger are rules governing the **construction** of written documents." *Id.* at 308, 350 S.E.2d at 197 (emphasis added). However, where the parties conceded that the document in question did not contain certain desired language, they did not seek its construction, but rather, reformation to accord with their true intent. *Id.*

The essential question becomes the parties' intent, and "[p]arol evidence is admissible to show mistake." *Id.* at 309, 350 S.E.2d at 198. The court recognized that "[i]t would be virtually impossible to prove mutual mistake as a ground for reformation without parol evidence." *Id.; see* 27 Richard A. Lord, *Williston on Contracts* § 70:52 (4th ed.2003) (stating the parol evidence rule "is inapplicable in a suit for reformation on the basis of mutual mistake" and noting one jurisdiction had remarked that "[i]t is practically a universal rule that in suits to reform written instruments ... parol evidence is admissible to establish the fact of fraud or of a mistake" (citation omitted)). Consequently, we confirm here the general principle that extrinsic evidence is admissible to prove mutual mistake in cases seeking reformation.

As an initial matter, however, we question whether the issue of reformation was properly before the circuit court. Reformation was not pled in this action for contribution and the issue was presented only in the context of Progressive's rebuttal to the Silver Dollar's motion for summary judgment. Moreover, the parties' settlement agreement was submitted to, and presumably approved by, the federal district court, and it is unclear whether Progressive ever formally sought reformation in that forum. *See Shipyard Prop. Owners' Ass'n v. Mangiaracina,* 307 S.C. 299, 307, 414 S.E.2d 795, 801 (Ct.App. 1992) (observing Shipyard conceded at oral argument that it did not request cancellation or reformation of the covenants and restrictions in its pleadings); *see also Theophelis v. Lansing Gen. Hosp.,* 430 Mich. 473, 424 N.W.2d 478, 486 (1988) ("Courts are required to proceed with utmost caution in exercising jurisdiction to reform written instruments."; the court noted the plaintiffs' request for reformation was made for the first time on appeal). In any event, we find Progressive has failed to demonstrate that the principle of reformation should be applied in this matter.

"A contract may be reformed on the ground of mistake when the mistake is mutual and consists [of] the omission or insertion of some material element affecting the subject matter or the terms and stipulations of the contract, inconsistent with those of the parol agreement which necessarily preceded it." *Crosby v. Protective Life Ins. Co.*, 293 S.C. 203, 206, 359 S.E.2d 298, 300 (Ct.App.1987). "A mistake is mutual where both parties intended a certain thing and by mistake in the drafting did not obtain what was intended." *Id.*

"Before equity will reform a contract, the existence of a mutual mistake must be shown by clear and convincing evidence." *Id.; see also Hann v. Carolina Cas. Ins. Co.*, 252 S.C. 518, 167 S.E.2d 420 (1969) (stating the burden of proof is on the party asserting the equitable issue of reformation to show a mutual mistake by clear and convincing evidence); *see also* 27 Richard A. Lord, *Williston on Contracts* § 70:51 (4th ed.2003) (same). "[E]ach suit for reformation stands on its own peculiar facts." *Belin v. Stikeleather,* 232 S.C. 116, 123, 101 S.E.2d 185, 188 (1957) (citation omitted). "Reformation is the remedy by which writings are rectified to conform to the actual agreement of the parties." *Crosby,* 293 S.C. at 206, 359 S.E.2d at 300.

A court may decline to impose reformation where it *unfairly* affects the rights of innocent third parties. *See Leonard v. Wash. Emps., Inc.*, 77 Wash.2d 271, 461 P.2d 538, 543 (1970) (stating a party seeking reformation must prove by clear and convincing evidence that "innocent third parties will not be unfairly affected by reformation of the writing"); *Cal. Cas. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 165, 913 P.2d 505, 510 (Ariz.Ct.App.1996) ("Whether the reformation can affect third parties depends upon whether they had notice of the mistake or of facts which should put them on inquiry notice. Generally, reformation cannot negatively impact the interest of an innocent third party who has acquired an intervening right or rightfully relied on the unreformed instrument to its detriment." (internal citation omitted)); *see also Restatement (Second) of Contracts* § 155 (1981) ("Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of

both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected."). The principle articulated in the *Restatement* applies in contexts beyond good faith purchasers for value, such as when a third party relies upon a property interest acquired under the original contract language. *Lunceford v. Houghtlin,* 170 S.W.3d 453, 464 n. 4 (Mo.Ct.App. 2005).

In *Lunceford,* the appellants executed a release with their insurer after having a motorcycle accident, then brought suit against the respondents, the tortfeasors who allegedly precipitated the accident. *Id.* at 457. Respondents asserted the release barred the action because it purported to release all parties and claims. *Id.* Appellants presented a "corrected release" and sought reformation on the basis of mutual mistake, arguing the settling parties did not intend to release the liability of all other persons. *Id.* The appellate court noted that reformation is a form of equitable relief, and it might not be available in situations where it would unfairly affect the rights of third parties, citing the *Restatement. Id.* at 464 n. 4. The court stated, however, that in this circumstance, "it is difficult to see how [the respondents] would be *unfairly* affected by reformation of the release" because they were not parties to the prior release, did not contribute funds to the settlement or otherwise compensate the appellants for their injuries, and there was "no showing that respondents relied to their detriment upon the original release." *Id.* The court commented that the effect of the language in the original release would be to grant the respondents a windfall, by absolving them of their potential liability as tortfeasors without any action or contribution on their part. *Id.*

In *Lunceford,* however, it appears the appellants promptly instituted an action against the non-settling tortfeasors within the statute of limitations, so the liability of the tortfeasors had not yet been extinguished at the time the settlement was executed. In contrast, no action was *ever* brought against the Silver Dollar, and its liability to Witherspoon was presumably extinguished by the running of the statute of limitations (barring any application of tolling, estoppel, etc.) prior to the

parties' settlement. Thus, the settlement did not operate to extinguish the Silver Dollar's liability, as it was *already* extinguished by the statute of limitations.

In *G & P Trucking v. Parks Auto Sales Service & Salvage, Inc.*, 357 S.C. 82, 591 S.E.2d 42 (Ct.App.2003), *cert. dismissed as improvidently granted*, 365 S.C. 23, 615 S.E.2d 454 (S.C. 2005), the Court of Appeals held that the running of the statute of limitations on a tort action does not extinguish a tortfeasor's liability so as to entitle a settling tortfeasor to contribution because the extinguishment of the liability "must have **resulted directly from the settlement itself,**" not from the prior running of the statute of limitations. *Id.* at 88, 591 S.E.2d at 45 (emphasis added). The court based its holding on the "plain language" of section 15–38–20(D), which provided that "[a] tortfeasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor whose liability for the injury . . . is not extinguished **by the settlement**. . . . " *Id.* at 87–88, 591 S.E.2d at 44–45 (citing S.C.Code Ann. § 15–38–20(D) (Supp.2002)).

The court stated it had "found nothing in section 15–38–20, or, for that matter, any other part of [UCATA], that would suggest that the running of the statute of limitations on an action arising from the underlying tort would 'extinguish' a joint tortfeasor's liability so as to entitle a settling tortfeasor to contribution." *Id.* at 88, 591 S.E.2d at 45; *see also Vermeer Carolina's, Inc. v. Wood/Chuck Chipper Corp.*, 336 S.C. 53, 68–69, 518 S.E.2d 301, 309–10 (Ct.App.1999) (reasoning "there was no 'common liability' that could have been discharged by the settlement agreement" because there was no liability that existed to be discharged). The court in *G & P* noted that the situation where a statute of limitations has run on a joint tortfeasor "is a rare occasion," and stated, *"We do not choose to torture the language of* [the extinguishment requirement] *to permit the seeking of contribution here even though it might seem fair to do so."* *G & P Trucking*, 357 S.C. at 88 n. 8, 591 S.E.2d at 45 n. 8 (alteration in original) (quoting *Pearson Bros. Co. v. Allen*, 131 Ill.App.3d 699, 86 Ill.Dec. 897, 476 N.E.2d 73, 75 (1985)).

While *G & P* was a statutory construction case, we agree with its concepts and find Progressive should not be allowed to

use the equitable remedy of reformation to resurrect its contribution rights against the Silver Dollar where the latter's liability was already extinguished by the time of the parties' settlement of Witherspoon's tort action. Since Progressive did not execute the settlement and pay any common liability of the Silver Dollar prior to the running of the statute of limitations as provided by section 15–38–40(D)(1), the only avenue available for Progressive to seek contribution was if an agreement extinguishing the Silver Dollar's liability was made while the tort action was still pending under section 15–38–40(D)(2). In this case, neither the First Covenant nor the Second Covenant extinguished the Silver Dollar's liability while the tort action was pending as any possible liability of the Silver Dollar was already terminated by the running of the statute of limitations.

At this point, where the Silver Dollar arguably has no liability as a matter of law, reformation would subject the Silver Dollar to contribution well after its exposure to liability had ended under UCATA. It would, in effect, allow Progressive to belatedly make the Silver Dollar a new, additional party to the terms of the settlement agreement in order to alter the application of the rules governing contribution. *Cf. Independence Nat'l Bank v. Buncombe Prof'l Park, L.L.C.*, 402 S.C. 514, 519–23, 741 S.E.2d 572, 575–76 (Ct.App.2013) (finding the master erred in reforming a mortgage to alter the parties' priority rights where reformation was made to correct an error in failing to have a party sign a subrogation agreement; the individual was not a party to the mortgage and reformation does not permit a court to write a new, additional party into the mortgage to correct the error); *id.* at 521, 741 S.E.2d at 576 ("A court of equity may not add or substitute other parties for those appearing on the face of a contract where the effect may be to make a new contract." (quoting 66 Am.Jur.2d *Reformation of Instruments* § 51 (2011))). The right to contribution and the equitable remedy of reformation are not unlimited. In these circumstances, as a matter of law, Progressive has not shown it is entitled to contribution or reformation.

## IV. CONCLUSION

For the foregoing reasons, we conclude the UCATA provisions governing the right of contribution preclude Progres-

sive's contribution action and that Progressive has not established that it is entitled to reformation. Consequently, we find no error in the circuit court's grant of summary judgment to the Silver Dollar.

**AFFIRMED.**

TOAL, C.J., KITTREDGE, J., and Acting Justices JAMES E. MOORE, and D. CRAIG BROWN, concur.