Lesley DUKE, Plaintiff,

v.

FLYING J, INC., Defendant.

Leslie Duke, Plaintiff,

v.

Pilot Travel Centers, LLC, Defendant.

Nos. C 15–2564 PJH, C 15–2566 PJH

United States District Court,
N.D. California.

Signed April 11, 2016

Lesley Duke, Elizabeth City, NC, pro se.

George A. Zelcs, Korein Tillery LLC, Chicago, IL, Guy D. Calladine, Carlson, Calladine & Peterson LLP, San Francisco, CA, Michael A. Lee, Susman Godfrey, LLP, Houston, TX, Robert J. Cardillo, Richardson, Patrick, Westbrook & Brickman, LLC, Charleston, SC, Robert L. King, St. Louis, MO, Ryan C. Kirkpatrick, Susman Godfrey, LLP, Los Angeles, CA, for Plaintiff.

Amy Crouch, Tristan L. Duncan, Mathew Lee Larsen, Shook, Hardy & Bacon, Kansas City, MO, Tammy Beth Webb, Shook Hardy & Bacon L.L.P., San Francisco, CA, for Defendant.

## ORDER DENYING PLAINTIFF'S MOTION TO TRANSFER VENUE; ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Phyllis J. Hamilton, UNITED STATES DISTRICT JUDGE

Before the court is plaintiff's motion to transfer venue of the above-entitled actions to the Eastern District of North Carolina, and defendants' motion for summary judgment as to all claims asserted by plaintiff in these actions. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby DENIES plaintiff's motion to transfer and GRANTS defendants' motion for summary judgment.

### BACKGROUND

The Constitution grants the Weights and Measures power to Congress in U.S. Constitution art. I, § 8, cl.5. In exercising this power, Congress established the National Bureau of Standards ("NBS"—now known as the "NIST"), and empowered it to "develop, maintain, and retain custody of the national standards of measurement, and provide the means and methods for making measurements consistent with

those standards." *See* 15 U.S.C. § 272(b)(2).

Congress directed NIST to "cooperate with the other departments and agencies of the Federal Government, with industry [and] with state and local governments ... in establishing standard practices, codes, specifications, and voluntary consensus standards." 15 U.S.C. § 272(b)(10). NIST has defined the "customary" "gallon" as "231 cubic inches" without reference to temperature. 33 Fed.Reg. 10755 (July 28, 1968); 40 Fed.Reg. 3486 (July 22, 1975).

NIST established the National Conference on Weights and Measures ("NCWM") to "ensure that uniform standards are applied to commercial transactions by developing regulatory standards for consideration by each jurisdiction." NIST Handbook 44, which has been adopted by every state at issue in the present case, (a) provides technical requirements for weighing and measuring devices, including motor fuel dispensers, (b) requires that motor fuel be dispensed to retail customers in gallons or liters; and defines "gallon as a unit of volume equal to 231 cubic inches" "exactly" and that "a unit is fixed by definition and is independent of such physical conditions as temperature" and provides as examples, "the meter, the liter, ... the gallon."

*Rushing v. Alon*, Case No. 06–7621, was originally filed in this court on December 13, 2006, as a proposed class action, asserting claims against numerous defendants under the consumer protection laws of Arizona, California, Florida, New Jersey, North Carolina, Texas, and Virginia. The original plaintiffs' claims all arose from the retail sale of gasoline and diesel fuel. Plaintiffs alleged that because the volume of motor fuel expands as its temperature rises, selling a gallon of motor fuel (231 cubic inches at 60 degrees Fahrenheit) at a temperature exceeding 60 degrees Fahrenheit ("hot fuel") without disclosing that fact to consumers or adjusting the price to compensate constituted an unlawful and deceptive business practice. In the first amended complaint, filed March 4, 2007, plaintiffs added claims under the consumer protection laws of Arkansas, Nevada, New Mexico, the District of Columbia, plus a claim of breach of contract.

On July 9, 2007, the case was transferred to MDL No. 1840 in the District of Kansas, Case No. 07–MD–1840, where it was coordinated for pretrial proceedings. On August 30, 2013, the Judicial Panel on Multidistrict Litigation issued a conditional remand order, directing that the claims asserted against certain defendants be remanded to this court. The MDL court subsequently severed the claims asserted against each of four defendants, created three new cases, and remanded all four to this court. The sole remaining plaintiff in the remanded cases was Lesley Duke.[1]

## MOTION TO TRANSFER VENUE

Plaintiff seeks an order transferring the above-entitled actions to the Eastern District of North Carolina. He references both 28 U.S.C. § 1406(a) and 28 U.S.C. § 1404(a). However, he provides no basis for a transfer under § 1406(a), and his sole argument in support of transfer under § 1404(a) is that "[i]t would be an inconvenience for plaintiff to travel approx. 3000 miles to appear in California court" and "it would also be an inconveni[en]ce for possible witnesses to travel to CA."

Defendants Pilot Travel Centers LLC and Flying J, Inc. ("Pilot/Flying J")[2] op-

---

1. This court granted summary judgment in Case No. C–06–7621 on March 25, 2016, and Case No. C–15–2567 was dismissed on December 16, 2015, pursuant to stipulation.

2. At the time this litigation commenced in 2006, Pilot and Flying J were separate entities. It is the court's understanding that they are presently owned by the same company.

pose the motion. First, they assert, § 1406(a) provides no authority for this case to be transferred, because plaintiff chose to commence this case in this court nine years ago, and thus waived the right to allege "improper" venue. Moreover, they contend, improper venue is an affirmative defense, which a defendant can raise either in its answer or in a motion prior to its answer. *See* Fed.R.Civ.P. 12(b).

Second, Pilot/Flying J contend that this case cannot be transferred under § 1404(a), for the additional reasons that plaintiff has not established that the suit "could have been brought" in the Eastern District of North Carolina, and has not established that the "convenience" factors warrant transfer. Defendants also note that a transfer for "convenience" should be brought as soon as the convenience becomes apparent, but that here, plaintiff has unduly delayed in seeking transfer.

In addition, Pilot/Flying J assert that plaintiff has not identified any witnesses who will be inconvenienced by the transfer, or the locations of any fuel purchases in North Carolina, or explained why, of all the possible states, North Carolina is the most convenient for witnesses and parties, including defendants. They contend that because defendants and witnesses will most likely have to travel no matter what venue is chosen, California is not materially worse than any other venue at this late stage of the litigation (particularly in view of the fact that all discovery is complete). They assert further that plaintiff knew he would have to travel to California from North Carolina when he filed the original complaint in 2006, when he filed the second amended complaint in 2009, and when he filed the operative complaint in his individual cases in the MDL (prior to the remand).

Finally, Pilot/Flying J argue, a change of venue so late in the case would preju-

dice them because such a change would substantially increase the expense of the litigation, as they would have to file another motion for summary judgment in the new venue.

■■■ The court finds that the motion must be DENIED. Plaintiff has not met his burden of showing that transfer is warranted under either § 1406(a) or § 1404(a). First, by choosing a particular forum to commence the action, a plaintiff is generally considered to have waived objections to proceeding in that forum. *See Olberding v. Illinois Cent. Ry. Co.* 346 U.S. 338, 340, 74 S.Ct. 83, 98 L.Ed. 39 (1953). Indeed, while a plaintiff may be permitted to challenge venue where the defendant misled the plaintiff as to its residence, causing the action to be filed in an improper venue, it is rare to see a motion to transfer venue made by a plaintiff. *See* Schwarzer, et al., *Federal Civil Procedure Before Trial* (2015 ed.) § 4:678.

Thus, plaintiff cannot show that the chosen venue is "improper," such that transfer is warranted under § 1406(a). In addition, plaintiff in this case has not established that the case "might have been brought" in the Eastern District of North Carolina, and has made no showing to support the "convenience" factors as required under § 1404(a).

## MOTION FOR SUMMARY JUDGMENT

Pilot/Flying J seek summary judgment against plaintiff, as to all claims asserted against them. Plaintiff did not file an opposition to the motion, despite having agreed to the briefing schedule set by the court at the further case management conference held on November 19, 2015.

In the second amended complaint ("SAC"), filed while the case was pending in the MDL court, plaintiffs asserted

breach of contract claims against Flying J and Pilot Travel Centers under the laws of a number of states, including Florida, Louisiana, Mississippi, Oklahoma, North Carolina, South Carolina, Tennessee, Texas, and Virginia.

Plaintiffs also alleged that Flying J had violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 et seq.; the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), N.C. Gen.Stat. Ann. § 75–1.1 et seq.; the (3) Texas Deceptive Trade Practices Act ("TDTPA"), Tex. Bus. & Com.Code Ann. § 17.46 et seq.; and (4) the Virginia Consumer Protection Act, Va. Code Ann. § 59.1–196 et seq., and that Pilot had violated the FDUTPA.

In their motion, Pilot/Flying J make three main arguments—that summary judgment is appropriate on the breach of contract and consumer protection claims; that all of plaintiff's claims present nonjusticiable political questions; and that all of plaintiff's claims are preempted.

In their first main argument, Pilot/Flying J assert that summary judgment is appropriate on the breach of contract and consumer protection claims. In the contract claim, plaintiff alleges that each time he contracted to purchase motor fuel from defendants, the parties' understanding was that he would pay a specified price for, and that defendants would deliver a unit of, a measure expressed in "gallons." SAC ¶¶ 241–245. He asserts that the definition of "gallon" under the petroleum industry standard known as ASTM–IP D 1250 is 231 cubic inches of fuel at 60 degrees Fahrenheit, SAC ¶¶ 88–93, 251, and that selling 231 cubic inches at a temperature greater than 60 degrees results in a "gallon" that contains less fuel, SAC ¶ 95. Thus, he asserts, because a "gallon" defined by volume without reference to temperature is "not a standard unit of measure," such a volumetric "gallon" is not the meaning of "gallon" intended by the parties in their agreements for sale of motor fuel, and thus constitutes a breach of the sales agreement. SAC ¶ 257–264.

Pilot/Flying J argue that plaintiff's breach of contract claim is meritless, for three reasons. First, they assert, the relevant legal framework in the states at issue is the same as that found in California, and that this court should grant summary judgment as to the contract claim for the same reasons that the MDL court granted summary judgment as to the California claim of breach of the implied covenant of good faith and fair dealing asserted against Chevron USA. See C–07–MD–1840 (D.Kan., Doc. 4600, Jul. 19, 2013) ("*Rushing* SJ Order"), at 33–34.

Second, Pilot/Flying J argue, just like California, the states at issue define "gallon" as exactly 231 cubic inches; have each adopted into their respective states' laws NIST Handbook 44; and have each defined "gallon" to exclude temperature consideration. Thus, they contend, as explained by the MDL court, any attempt by plaintiff to construe the term "gallon" to mean temperature-adjusted gallon is contrary to law and facially unreasonable. *See id.*

Third, Pilot/Flying J assert, the contract claim fails because, as plaintiff conceded in his deposition, he knew that defendants were dispensing non-temperature-adjusted motor fuel, yet he freely paid the price per gallon shown on the station's price sign and dispenser. That is, he deliberately entered into transactions with full knowledge that the retailers understood "gallon" to mean one thing but now claims he secretly believed the term to mean something else (temperature adjusted fuel). Defendants contend that no viable breach-of-contract claim can stand under these circumstances.

Pilot/Flying J also contend that the statutory claims fail as a matter of law. They note that the MDL court dismissed the California unfair competition claim in the *Rushing* case because California law protected the defendants from liability for claims regarding the manner in which defendants dispense motor fuel—by the gross gallon, without disclosing or adjusting for, temperature. *See id.* at 19–29.

Pilot/Flying J reiterate that all the states at issue (Florida, Louisiana, Mississippi, South Carolina, North Carolina, Oklahoma, Tennessee, Texas, and Virginia) define "gallon" as "a volume of liquid—231 cubic inches to be exact—regardless of temperature"; have adopted the NTIS Handbook 44 into their state law; and have defined "gallon" to exclude temperature considerations. Thus, defendants argue, each of these states' laws authorizes the conduct at issue, and plaintiff's attempt to change the law regarding the terms of this retail transaction (purchase of motor fuel) is facially unreasonable.

Pilot/Flying J note that Handbooks 44 and 130 [3] draw bright lines between retail and wholesale transactions, and between retail motor fuel and other fuel products; and that the Handbooks expressly recognize automatic temperature compensation ("ATC") to 60 degrees Fahrenheit in *wholesale* motor fuel and other fuel-delivery applications, but that in contrast, the provisions applicable to retail motor fuel sales make no mention of ATC, and actually require a non-temperature compensated method of sale.

Pilot/Flying J assert that North Carolina and Texas provide for virtually identical common law protections, and demand the same result as California law; that Florida and Virginia law provide even more persuasive protections via an express statutory safe harbor, and that both the FDUTPA and the VCPA expressly bar plaintiff's consumer protection claims. Defendants reiterate that there can be no violation of FDUTPA, VCPA, NCUDTPA, or TDTPA where the alleged misconduct is required or specifically permitted by federal or state law, and that each of these states' laws require that motor fuel be sold on a volumetric basis (without reference to temperature).

Finally, Pilot/Flying J argue that the method of sale that plaintiff is seeking to foist upon defendants is itself illegal, as defendants cannot lawfully sell fuel at retail with reference to temperature, and cannot use an ATC device for the retail sale of motor fuel in Florida, Virginia, North Carolina, and/or Texas, without third-party regulators first changing the law to permit ATC and a temperature-reference method of sale. Pilot/Flying J contend that in 2007 and 2009, the NCWM rejected proposals to change the law to permit or mandate a temperature-compensated method of sale for retail fuel sales, and that these attempts to change the law occurred after multiple studies had been conducted on the costs and benefits of a temperature-compensated method of sale. They assert that the NCWM vote left in place the current law, which permits only the retail sale of fuel in volumetric gallons, without reference to temperature.

In their second main argument, Pilot/Flying J contend that all of Mr. Duke's claims present nonjusticiable political questions. The "political question" doctrine prevents courts from making policy choices and value determinations that are committed to the political branches.

In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme

---

**3.** NIST Handbook 130 lists uniform laws and regulations in the area of legal metrology and engine fuel quality developed by the National Conference of Weights and Measures (NCWM), and summarizes the adoption of those laws and regulations by the states.

Court laid down the following six independent tests, any one of which renders a case a non-judiciable "political question," as follows:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

> Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence. The doctrine of which we treat is one of "political questions," not one of "political cases."

*Id.* at 217, 82 S.Ct. 691, *quoted in U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 456, 112 S.Ct. 1415, 118 L.Ed.2d 87 (1992).

Defendants contend that the first two factors are present here. They assert that it is undisputed that there is a "textually demonstrable commitment of the issue to a coordinate political department," as the Constitution explicitly commits to Congress the power to fix "Standards of Weights and Measures."

In addition, they argue, resolving plaintiff's claims requires a "quantifying judgment that is unguided and ill-suited to the development of judicial standards." They contend that numerous technical and logistical issues must be determined for retail temperature compensation that defy resolution by any judicial standard – including product densities, volume correction factors, and specifications for field inspection test procedures and disclosures in labeling, signage, and receipts. They assert that evaluating the pros and cons of alternative retail sale methods is a quintessential legislative function, and moreover, that it would be improper for the court to re-evaluate the need to adopt temperature compensations requirements for the retail sale of motor fuel when the political branches have already rejected such a requirement.

In their third main argument, Pilot/Flying J argue that all Mr. Duke's claims are preempted. They note that federal law can preempt state law in three ways—express preemption, field preemption, and conflict preemption, and assert that this case involves both field preemption and conflict preemption. They contend that field preemption applies because of the broad grant of congressional authority to NIST to "secur[e] uniformity in weights and measures," *see* 15 U.S.C. § 272(c)(4), and argue that because of this broad grant of authority, plaintiff's interference with the policy choice of allowing sales of retail motor fuel without reference to temperature is preempted. They assert that conflict preemption also applies, to the extent that compliance with both federal and state law is impossible.

■ The court finds that the motion must be GRANTED, as to both the claims of breach of contract, and the claims under the consumer protection statutes of the states at issue. First, plaintiff cannot establish breach of contract. As is true under California law, the fundamental goal of contract interpretation in the states at issue is to give effect to the mutual intention of the parties as it existed at the time they

entered into the contract. *See* La. Civ. Code art.2045; *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So.2d 748, 752 (Miss.2003); *Cossey v. Cherokee Nation Enters., LLC*, 212 P.3d 447, 468 (Okla.2009); *Progressive Max Ins. Co. v. Floating Caps, Inc.*, 405 S.C. 35, 747 S.E.2d 178, 183–84 (2013); *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn.2002).

Moreover, the court interprets the parties' intent based on objective, rather than subjective criteria. *See* La. Civ.Code art.2045 (2013), Revision Comments—1984, (b); *Tupelo Redev. Agency v. Abernathy*, 913 So.2d 278, 284 (Miss.2005); *Whitehorse v. Johnson*, 156 P.3d 41, 47 (Okla. 2007); *Laser Supply and Servs., Inc. v. Orchard Park Assocs.*, 382 S.C. 326, 334, 676 S.E.2d 139 (S.C.App.2009); *Moody v. Realty Co., Inc. v. Huestis*, 237 S.W.3d 666, 674 (Tenn.App.2007).

Further, the Court construes the words of a contract according to their ordinary and popular sense, and when the words of a contract are clear, the agreement's language controls. *See* La. Civ. Code arts.2046, 2047; *Miss. Farm Bureau Cas. Ins. Co. v. Britt*, 826 So.2d 1261, 1266 (Miss.2002); *Whitehorse*, 156 P.3d at 47 (Oklahoma); *Baugh v. Columbia Heart Clinic, P.A.*, 402 S.C. 1, 23, 738 S.E.2d 480 (S.C.App.2013); *Perkins v. Metro. Gov't of Nashville*, 380 S.W.3d 73, 85 (Tenn.2012).

In addition, generally speaking, the law existing at the time and place the contract was made is part of the contract. *See Breaux v. Avondale Indus., Inc.*, 880 So.2d 36, 37 (La.App. 4 Cir.2004); *Ivison v. Ivison*, 762 So.2d 329, 335 (Miss.2000); *Pub. Serv. Co. of Okla. v. State ex rel. Okla. Corp. Com'n*, 115 P.3d 861, 884 (Okla.2005); *Catawba Indian Tribe of S.C. v. State*, 372 S.C. 519, 591, 642 S.E.2d 751 (S.C.2007); *Ellis v. Pauline S. Sprouse Residuary Tr.*, 280 S.W.3d 806, 814 (Tenn. 2009).

Second, just like California, the states at issue define "gallon" as exactly 231 cubic inches, have each adopted into their respective state's laws NIST Handbook 44, and have each defined "gallon" to exclude temperature considerations. *See* Fla. Stat. § 531.40; La. R.S. 3:4604; LAC XXXV. 129 (2011); 2–1–4:09 Miss. Admin. Code § 116.01; 2–1–4:08 Miss. Admin. Code § 100.02.5; Miss.Code § 75–27–5; N.C. Gen.Stat. § 81A–2; Okla. Stat. tit. 2, §§ 14–34; 14–3; 14–32B; Okla. Admin. Code tit. 165, §§ 15–15–7, 15–7–1; and tit. 35 §§ 10–15–1, 10–15–2, 10–15–3; S.C.Code Ann. § 39–9–60; Tenn.Code Ann. § 47–26–907(a); Tex. Agric. Code Ann. §§ 13.024, 13.02; 4 Tex. Admin. Code § 12.10; Tex. Tax Code § 16.001(27); Va. Code Ann. §§ 3.2–5604, 3.2–5606, 3.2–5620, 3.2–5700.

Thus, any attempt by plaintiff to construe the term "gallon" to mean "temperature-adjusted gallon" is contrary to law and facially unreasonable. *See Rushing* SJ Order at 33–34 ("[P]laintiffs' attempt to construe the term 'gallon' to mean temperature-adjusted gallon is both contrary to [ ] law ... and facially unreasonable.") The MDL court explained that the law defines "gallon" as exactly 231 cubic inches and found that no reasonable consumer could understand it to mean something different. *Id.*

Finally, plaintiff's contract claim fails for the additional reason that he knew the defendants were dispensing non-temperature-adjusted motor fuel—a fact plaintiff freely admitted in his deposition. *See* Deposition of Lesley Duke, Exh. B to Declaration of Tammy B. Webb (Doc. 36–4), filed herein on December 16, 2015, at 86–88, 133–135. Yet plaintiff nonetheless concluded his purchases by paying the price per gallon shown on the station's price sign and dispenser. He deliberately entered into transactions with full knowledge

that the retailers understood gallon to mean one thing, when he claims he secretly believed the term to mean something else (i.e., that "gallon" signified temperature—adjusted fuel). No viable breach-of-contract claim can stand under these circumstances.

■ Nor can plaintiff prevail on his claim of violation of state consumer laws. As indicated above, the MDL court dismissed the California unfair competition claim in *Rushing* because California law protected the defendants from liability for claims regarding the manner in which defendants dispense motor fuel—by the gross gallon, without disclosing or adjusting for temperature. *See* Rushing SJ Order, at 19–29. The court pointed the California Supreme Court's decision in *Cel–Tech Commcn's, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 182, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999), which stands for the principle that conduct expressly authorized by law cannot be subject to liability. As the court noted, "in statutory construction, specific governs general." Rushing SJ Order at 19. Similarly, conduct authorized via a specific consumer protection statutory scheme, *i.e.*, the Weights and Measures regime, cannot impose liability under a general consumer protection statute. *See id.* at 19–20, 24. Conduct cannot be lawful and unlawful at the same time.

Handbooks 44 and 130 draw bright lines between retail and wholesale transactions and between retail motor fuel and other fuel products. The Handbooks expressly recognize ATC in wholesale motor fuel and other fuel-delivery applications. In stark contrast, the provisions applicable to retail motor fuel sales make no mention of ATC. Instead, the provisions applicable to retail motor fuel sales require a non-temperature compensated (non–ATC) method of sale. The express recognition of ATC for other fuel-delivery applications, yet their silence

on ATC for retail transactions, must be construed as intentional—as a prohibition against ATC at retail.

Both North Carolina and Texas provide for virtually identical common law (specific authorization) protections and demand the same result as under California law. Florida and Virginia law provide even more persuasive protections via an express statutory safe harbor. There can be no violation of the FDUTPA, VCPA, NCUDTPA, or TDTPA where the alleged misconduct is required or specifically permitted by federal or state law. *See* Fla. Stat. § 501.212; *Prohias v. Pfizer, Inc.*, 490 F.Supp.2d 1228, 1233 (S.D.Fla.2007); Va.Code Ann. § 59.1–199; *Smith v. U.S. Credit Corp.*, 626 F.Supp. 102, 103 (E.D.Va.1985); *Strategic Outsourcing, Inc. v. Cont'l Cas. Co.*, 414 F.Supp.2d 545, 554–55 (W.D.N.C. 2006); *Boales v. Brighton Bldrs., Inc.*, 29 S.W.3d 159, 165 (Tex.App.—Houston 14th Dist.2000).

Each of these state's laws and administrative regulations/procedures require that motor fuel be sold on a volumetric basis (without reference to temperature), and provide specific penalties if motor fuel is sold on another basis. They have all adopted the NIST definitions of basic units of weights and measures, including Handbook 44, which provides that one gallon of retail motor fuel is defined as exactly 231–cubic-inches, irrespective of temperature. *See* Handbook 44, § 3.30 ¶ S.1.2.1; id. App. B at B–3; id. App. C at C–5, C–11, C–17; *see also* Fla. Stat. § 531.40 (adopting Handbook 44); Va.Code Ann. §§ 3.2–5604, 3.2–5606, 3.2–5620, 3.2–5700 (adopting Handbook 44); N.C. Gen.Stat. § 81A–2 (adopting Handbook 44); Tex. Agric. Code Ann. §§ 13.024, 13.025 ("[t]he gallon contains 231 cubic inches."); 4 Tex. Admin. Code § 12.10 (adopting Handbook 44); Tex. Tax Code § 16.001(27) (" 'Gallon' means a unit of liquid of measurement as

customarily used in the United States and that contains 231 cubic inches by volume."). Thus, the specific statutory consumer protection scheme that authorizes the challenged business practices at issue here is the same for all states at issue.

Finally, while not necessary to the decision, the court finds that summary judgment is appropriate for the additional reasons argued by defendants – that the claims present nonjusticiable political questions, and that they are barred under the doctrine of field preemption.

## CONCLUSION

In accordance with the foregoing, the court finds that plaintiff's motion to transfer venue must be DENIED, and that defendants' motion for summary judgment must be GRANTED. This order terminates these cases and any pending motions.

**IT IS SO ORDERED.**